Good morning. Good morning. I'd like to reserve three minutes, please. My name is Andrea Waters, and I represent Bernadette Alcozar-Murphy. Can you move the mic down a little bit? I sure can. Is that better? Okay, thank you. And I represent Bernadette Alcozar-Murphy. I just wanted to sort of do a quick summary. I know you're familiar with the facts, but Bernadette was hired to work at ASARCO as a long-haul truck driver in 2005, and she worked there for 12 years. She also was a member of the local union, who is the other defendant in this case, for eight years. Events occurred for Bernadette in December of 2012, where she lost her vision. She became completely legally blind, and she thought it was due to something from an elk hunt. She'd gotten something in her eyes hunting elk, but it turned out it was just a genetic issue. But she qualified for and went on family medical leave. She then returns from the family medical leave on February 21st of 2013, and this is where the problems began. And what I wanted to address with the court are some of the issues, I think, in the lower court's order that were problematic for the case itself. And one of those is that she returned. What she testified to is not part of the court's finding, but what she did was when she returned to work that morning, she had a work release for her eye condition. She had also previously had some treatment for a low back injury. She was not off work for the low back injury. There were no work restrictions for the low back injury, but she had made her employer aware that that was something out there for her. She returns to work. She meets with Rosa Aguirre, who is the human resources representative, and there's an exchange where Bernadette has the work release for the eye condition. She has nothing for the low back because she's not off work for the low back. There's pressure put on her at this meeting to not come back to work, to continue off until she either has a work release for the low back, which is unrelated, or to take what ASARCO has to offer, which is sort of an internal little they pay you per day to stay off of work. It's not work comp, but it's a little bit insurance policy that they have within ASARCO to take her off of that. I know that I think you said in your brief that that was part of some broader pattern. Yes. And what's the incentive on the employer's part to discourage workers from coming back? Well, my understanding is that they had two problems. One of them Rosa Aguirre testified to. They didn't want injured workers coming back to work and falling under worker's comp. This went off on summary judgment. I'm sorry. So when you say she testified to, what are you talking about? What part of the record? I apologize. In her deposition, Rosa, I took her deposition, and Rosa Aguirre testified in her deposition that there were concerns about employees coming back who had previous FMLA leave injuries and then having an on-the-job injury. So they were concerned about worker's comp claims coming back. Yeah, but isn't the bottom line at least of that? Yes, sir. One of the things that I have questions about. They took her back. So he says, are you sure your back is all right? I mean, this was something like a two-hour discussion, and they paid her for it, the two hours. I agree with you. And what sort of gets me is then she wants to file a grievance because of that two hours. I mean, I just sort of struck me. It may have nothing to do with the law. I mean, the way the case is legally resolved, but it sort of struck me. So what? Well, I think the issue wasn't that there was a ‑‑ she wasn't asking for the two hours at that time. What she was concerned about is that she was feeling pressured to stay off of work, and given what was happening at ASARCA, which is where the previous 35 people prior to her had also been on FMLA medical leave, and what would happen, Your Honor, based on the deposition testimony of Mr. Duarte, was these 35 others just prior to my client, she would have been 36, had been on FMLA medical leave, and then they would come back to work, and they would be told to stay off or pressured to stay off. They then go on this little internal insurance policy with ASARCA and were then being terminated for job abandonment because they had a work release that said, hey, you should be back here on this date, but they'd stayed off additional days for job abandonment. And Mr. Duarte, the union president, had personally handled those claims, and that's what he testified to had preceded Bernadette Alcazar Murphy. So the two hours comes up later, but in that initial meeting with the HR person, she was upset with the exchange and feeling pressured to stay off, which is why she then called for the union reps to come meet her there in the HR office, which is what occurred. So that's what sort of elevated it. It wasn't just come back to work, you're ready to go. But you're right, they did put her back in the same position. In the interest of time, can I just ask you to skip ahead? Because the thing that really matters is not even the first meeting where she was paid, but it's that second meeting. And just help me with this. My review of the record suggests that the company seemed like it was in the right to say that you didn't have the authority to go into the system on that day and add – it wasn't even like two extra hours, it was like overtime, give herself overtime, and they said you weren't authorized to do that. And why isn't that a justifiable reason to terminate her? Here's why. Because of the testimony of Eric Duarte, which is consistent with what Bernadette said in his deposition. He said the same thing, which actually isn't quoted completely in the decision by the court. What Mr. Duarte said is there's no written policy about people getting paid. And I should back up. I'm not being as clear as I should be here. When she went into the meeting with the union representative, the second – The first meeting? I'm talking about the second one. The second meeting. Where she thought the SARCO person was going to be there, right? Yes, sir. Exactly. We're on the same one. That's the meeting, I believe, on the 26th of February. And she goes in. She believes she's going to meet with the union president and her supervisor from the SARCO. That's what she testified to. She shows up. She clocks in. She also testifies that at that time there's a level five supervisor, this jack old father, sitting in an office, and she tells him, I'm going into a meeting with the union president. She's already clocked in on their computer thing. She's early, two hours early for her regular shift. She checks in with him. She testifies that jack old father writes it on a paper calendar, and she goes in to meet with Eric Duarte. Now, here's where she testified that she believed the union – excuse me, a SARCO's boss, Mr. Smith, was going to come to that meeting. He never showed. But she continued in the meeting with just Mr. Duarte for the two hours and then left the meeting and went to her regular shift. The subsequent testimony that's not cited in the order is that Mr. Duarte testified, hey, there's no written policy. That they cited in the order. That's true. A SARCO had no written policy that said you're going to get paid if you come to meet with the union rep here on company grounds. But as a practice, Mr. Duarte said they always got paid. In his deposition, he said they got paid. Not for meeting one-on-one with the union rep. Correct. But on company property. In his deposition, he says if it's on the company property, not just like if they met in a bar or at the company offices, at the union offices, then you're correct. They didn't get paid. Outside of her shift. Outside of her shift, correct. Yes, ma'am. I thought, actually, that he, even the union rep person, said no. There is no – everybody knows that if it's just me and an employee meeting, just the two of us, even if it was on company property, you don't get paid for that and everybody knows that. You only get paid when it's like either the company sort of requires it or there's some company person there. Actually, I wish that I – I'll find that before I do the rebuttal for you. But I'm confident that he testified that if it's on company property, then they get paid and that's the way they got paid. Whether there's a company representative there or not. Correct. Okay. Correct. And that he got paid and he, in fact, believed she should have gotten paid for the two hours because he challenged that, as you know, as the union rep. He appealed it. He said she should have gotten paid for the two hours and she shouldn't have been terminated. So he testified that he believed that that was wrong and he got paid. But the issue is not necessarily whether she should have gotten paid or not, but her alteration of the document. Right. Which she didn't – she testified she didn't alter a document incorrectly. Here's how it worked, Your Honor. There's a – She testified that she had – that what she did was corrected? Yes. Is that her theory? Yes. Because – And it doesn't matter whether she had – whether it was okay for her to go in and do that rather than asking them to correct it? No. Actually, she felt it was okay because of what she testified she did in terms of procedure. She had already cleared it with Mr. Oldfather, a supervisor. She testified in her deposition that she told other supervisors who were at the pit – it's like a pit room and they have a clipboard with these log sheets that are public so you could go in and you could see how many hours I worked and we could all see each other's hours and time. So it's not a secret document. And what she did was take that log sheet down in front of other supervisors, make the changes, clear it with a dispatch, which she testified, and so did the dispatcher that he was called. That's that Greg Zaragoza. He said, oh, yeah, she called, said she was going to put down the extra time. So she tells him, she puts it on the log sheet, makes the change, puts it up there, and turns it in. She believed she was okay to do this and did it very publicly. This is not that she went into a computer and just entered data and it was never seen again. Those long sheets were hung up on a board. And she cleared it with several people beforehand. It's two hours of overtime, and she put it through every system and thought she was okay to do it and thought she was qualified to get it, which was supported and corroborated by Mr. Duarte and what she testified to in her deposition. Yes, sir. One that does bother me. Has this been arbitrated yet? No, which is I want to make sure I get to that about the union as well if I've covered what you were concerned about with the second meeting. Is it possible to mediate this? I don't know how much I can tell you. Since you can't get arbitration, maybe we could give you a mediator. I'm a plaintiff's lawyer. We always try that route, so yes. But we haven't had any success, so I'm with you on that. I would love for that to have occurred. But there's been no arbitration that she's attended at all. And, in fact, the only time, and that's what I wanted to focus with on the second half of this case, which was the union issue, which is this. What bothered me about the dismissal of the union is in looking at the line of cases, I realized that the union is entitled to some delays. That's totally reasonable, things that might be delayed because they don't have staffing or those issues. But this case is unique. In this case, the deposition testimony of, I think I had four witnesses who all testified, Mr. Duarte, Zaragoza, Phil, I'll think of his last name as soon as I sit down. The witnesses that I deposed were all union folks, said they had had grievances sitting out there and that the union had taken the position that they were not going to take any cases to arbitration until they had a new contract with ASARCO. The problem is, by the time I deposed these folks in November of 2015, they still didn't have a contract. So my clients terminated back in 2013, they still don't have a contract in 2015. Do they have one now? I will tell you what I know. I don't know about now, but I do know that when I filed my motion for reconsideration, I attached another letter to the lower court judge that showed they still weren't doing it, and that's just post the order, that they still weren't taking cases to arbitration yet. And where that becomes problematic is we get on that sliding scale then of what is arbitrary. It's not negligent to put everybody off indefinitely. I think we slide down that scale into a reckless disregard because this is their livelihood. You have people who have lost their jobs, and the court says, well, there was an arbitration requested. That's not a complete statement. The local union guys were trying. They did the four steps of the grievance process. They were trying to help out their coworkers, there's no question. The problem came when it kicked up to the national level and they're supposed to set the arbitration, they're just not setting them. And in this case, yeah, it was requested by the local guys, but it never happened until after we sued them. Does this go only to your 301 claim? This part, yes. Yes, ma'am. So in order to succeed there, you have to also show that the employer breached the agreement. Yes, well, that certainly is part of the... And so that part of your claim is what? Well, that part of my claim is that I think that they're in bed together on this. I mean, they both benefit from there being no arbitrations. So there definitely is... I mean, it's a financial windfall to take all the employees' dues, which continued, there's no refund. Take your dues as an employee. And ASARCO knows because they're quite public about the fact that they're not taking any cases to arbitration. What's the harm? Let them go. So the union violated its duty by not taking it to arbitration and the employer breached the contract by not taking it to arbitration. Yes, ma'am. Yes. And everybody benefits except for the union workers that get caught. Not after she was fired, up to the time she was fired, because they were taking them out of her paycheck, but not after she was fired. Her last day was March, excuse me, February 27th when they walked her off the property, but her official termination came March 4th of 2013. Let me suggest that you stop, because we've taken you below your three-minute mark. But we'll give you a couple minutes for rebuttal. Thank you. And let's hear from counsel first. Thank you very much. Good morning, Your Honors. My name is Antonia Domingo. I'm representing the United Steelworkers Union Local 5252, and I'm splitting my time with my co-defendant. I'll be taking five minutes, and he'll take the remaining ten. So to start, you know, Ms. Alcazar Murphy claims that the union abandoned her grievance. I wanted to clear up an issue. This is incorrect. The union actually timely appealed Ms. Alcazar Murphy's grievance, which is undisputed, and therefore preserved her right to challenge her discharge. So this is not a case in which the union missed a filing deadline, for example, or otherwise fully extinguished Ms. Alcazar Murphy's right to challenge her discharge. But why hasn't there been no arbitration all these years? So the union, as Ms. Waters stated, the union did delay in taking grievances to arbitration while it was involved in difficult contract negotiations. The union did make a request to schedule this arbitration, and my understanding is that the company's position is that it was not going to arbitrate this grievance while this litigation was pending. The union has made several requests to schedule this grievance, and we are prepared to arbitrate this grievance tomorrow. We just can't do it while this litigation is pending. Is the record that the employer refused to arbitrate while the litigation was pending? It's in that the company makes this argument in its response to the union's cross-claim, which you filed in the district court litigation attempting to have the company arbitrate Ms. Alcazar Murphy's grievance. I don't understand that. What's the legal basis for that? We're saying we're not going to do it. We couldn't do it first because we were distracted by contract negotiations, and now we can't do it because you've sued? Well, the legal standard is whether the union is acting arbitrarily, discriminatorily, or in bad faith, and there's cases that say if a union delays in arbitrating a grievance due to contract negotiations, that that's not a breach of the duty. We attempted to schedule this grievance while this litigation was pending. The company has taken the position that it will not. Due to the appeals, the company is not willing to schedule the arbitration, and we don't have control over that. But, again, we are prepared to arbitrate Ms. Alcazar Murphy's grievance and are planning to do so. What remedy do you have if the company says we don't want to arbitrate? We can sue the company, which we did. We filed a cross-claim in the district court litigation, and that claim was dismissed. Yes, Your Honor. I mean, you're right that the case I'm remembering is, I think, either Dent or Dente. That does give you, as the union, the ability to kind of say, hey, until we get the contract negotiated. But not forever. I mean, she was terminated five years ago or more than that, right? At some point, you can't just continue to say, well, we're in contract negotiations, right? I mean, I understand temporarily. We have other priorities. We're going to put this on the back burner. But at some point, doesn't your time run out for that? There's several things in response to that, Your Honor. First, we have taken several steps in an attempt to arbitrate this grievance. And second, the standard doesn't look at the amount of time. And there's a good reason that courts haven't set a specific, say, three years, five years. It's because the standards, whether the union has acted arbitrarily, discriminatorily, or in bad faith, taking account of the legal and factual landscape at the time the union acted or it didn't act, and that sort of case-by-case analysis doesn't allow to say, you know, it's this amount of time. The facts here in the record, there's no evidence here that the union breached that standard. I'm not sure I understand what your position is. Is it your position that you can wait forever or is it your position that you are willing to arbitrate and that's in this record but it's the employer who is holding things up? Our position is nothing that we did violated the duty of fair representation. To use a phrase from the last argument, that's not responsive. Sure. The record shows that we attempted to arbitrate her grievance. We've made, you know, several attempts. Where do we look to see what you did? There's the cross-claim in the district court litigation. There's a written letter from a union representative to the company requesting to schedule the arbitration. And I believe there are also, I'm not sure if they're e-mails, but there's some documentation that the union made additional requests in an attempt to schedule this arbitration. Just so I'm clear, whatever contract negotiations were ongoing way back when, I assume those have been concluded, right? We do have a contract, and Ms. Alcazar-Murphy points to additional grievances that were pending. We've been able to settle those, and that's why those have not been arbitrated. Okay, but at this point, the only barrier toward moving forward with the arbitration, then, is you're saying it's basically pointing the finger at your colleague there. Yeah, the company's position is it won't arbitrate while this is pending. The requests that you made, were they made before or after this litigation began? The request to the- So we appealed her grievance before this litigation began. The request was made after the litigation. Your requests that you just described were made after the litigation. Our request to schedule the arbitration was made after this litigation. But again, I mean, the Ninth Circuit- To start the arbitration process. Yeah, a few things in response to that, Your Honor. First, Ms. Alcazar-Murphy never contacted the union to ask about the status of her grievance. So we don't know whether it would have taken a lawsuit. I mean, she could have taken steps below that, such as contacting her union representative to ask what was going on. Second, you know, the Ninth Circuit has considered cases where similar arguments have been raised. So in Castaneda v. Durevent Corporation, for example, the plaintiffs there claimed that they had to sue the union for the union to process their grievances. The court there didn't find a breach of the duty of fair representation. It pointed to the fact that eventually an arbitration happened. And here we are trying to arbitrate this grievance. Okay. Thank you, counsel. Thank you. Let's hear from counsel for the company. May it please the court. Good morning, Your Honors. Olly Farhang for ISARCO. Would you agree to arbitrate right now? Absolutely not, Your Honor. The plaintiff had the opportunity to withdraw the lawsuit and arbitrate, and she chose the venue of going through federal court, which is—and the case was— But why don't people come to federal court and they settle cases? It seems to me the issue is why not—there's a dispute. Why not arbitrate it instead of spending—I don't know how much it's costing your employer, the union, to litigate this. And it seems to me the most logical way out of this. She wants arbitration. You say you did nothing wrong, which presumes that you may win. Why not arbitrate? You know, I'm used to, in the district court, I would turn off the machine and I would go off the record and say this. But it just seems to me that that's sort of an obvious way to resolve this. Your Honor, I wish you were around three years ago because I was saying the same thing. And the plaintiff wouldn't—I mean, we're talking about stuff that's outside the record right now. But the plaintiff wouldn't withdraw their litigation and arbitrate. She chose her form. We went through discovery. We've gone through the whole litigation process, all the time and expense. She had her hearing—she had her matter heard before a federal judge. Summary judgment was granted against her. Can I ask, just because what you've said seems to directly conflict with what your colleague said a minute ago, when in this process were you willing to—when was the company willing to arbitrate? And it was—or I guess it sounds like you're saying you were willing to arbitrate, but only if she dismissed the lawsuit with prejudice? Is that— We didn't want to have to try the case in two different venues, which I don't think we were obligated to do. And I think that judicial efficiency would be— You could have stayed the district court proceedings pending arbitration. I doubt that there's any trial judge who would have said, oh, no. So could the plaintiff. So could have the plaintiff. Well, are you willing to mediate it now? Your Honor, we've already gone through the entire litigation process. The plaintiff asserted two claims for relief. Both claims were dismissed because there are no genuine issues of material fact. So the answer is no? The answer is no. Okay, just say that. Yeah, no. I don't know. Yeah, fair enough. I don't know if that's your answer. Fair enough, fair enough. And if you were to lose in some respect before us, this would be continued? It would be continued. And I guess we would have to determine which would be the proper form, and we would have to litigate it through that form, to be fair. I mean, this case started with two claims, retaliation for a wage claim and retaliation for the plaintiff exercising her FMLA rights. It has then morphed into, without any amendment to the pleadings, but just in the summary judgment motions and different pleadings, it's morphed into a whistleblower case. It's morphed into a wage claim under the Arizona statute for wages. Now, today for the first time, it's morphed into a conspiracy between ASARCO and the union. At some point, Your Honor, the facts are the facts. You can't strum a guitar without any strings, and you can't prosecute a case without any genuine material facts that are in dispute. She walked in. She altered her records. She posted it. She didn't get any supervisor approval. And under the code of ethics, under the basic labor agreement between ASARCO and the union, ASARCO was fully within its rights to terminate her employment, and it did so. What are the facts as to her entitlement to be paid? Help me with that, because your opponent, of course, says that the union rep person testified in his deposition that, in fact, she was entitled to be paid. Yes. So it wasn't like she was stealing money from the guy. That was part of what the company initially said, if I remember. Well. You were stealing money because you were claiming an entitlement to be paid for these hours that you absolutely were not. That's what it was. It was an act of dishonesty. And Mr. Duarte's deposition, which I have the transcript exactly as it is in front of me, page 97, lines 1 through 6. The question is, let me get back to my original question, though, which was in the contract, BLA, as you understand it, is there any written provision saying that employees are entitled to be paid for meeting solely with you with no ASARCO representative? Answer, no. Just what page of the excerpts of record are you on? Excerpts of record, I am, I don't know if I've got the right one. It might be 0003, but it's. What page of the deposition transcript did you say? Page 97, lines 1 through 6. And what's line 1 on your page? I think it's let me get back to. Oh, yeah, yeah. Okay, good. I'm on the right page. Go ahead, sir. Now, in the response to the motion for summary judgment, that section was left out. The section above was what was cited by opposing counsel. That aside, the fact of the matter is, is she was scheduled for that day at 3 p.m. to work. Nobody at ASARCO knew she was meeting. This is all the testimony during depositions. Mr. Duarte said, yeah, I'm going to be in basically office hours from 1 to 3. Didn't know if she was going to show up or not. She shows up at 1 o'clock. Allegedly is there for two hours. We weren't even aware of the meeting. She says that at the prior meeting there was some understanding reached that we will, the three of us, I guess the union rep, the company person, and the plaintiff, would reconvene on this particular day? Well, Mr. Duarte, the union rep, says that didn't happen. She doesn't have any evidence that it did happen. All the ASARCO employees that are in the room, there's no evidence that they say that it happened. The only evidence that Ms. Murphy has in this case is her own testimony and allegations. And despite the fact that there's all these witnesses, not one of them corroborates what she says as to any claim whatsoever. Would you like me to move on to any other? No, this is a motion. This is a summary judgment. Isn't her testimony enough? It's not enough. Mere allegations and denials by the plaintiff. Well, was she deposed? She was. Did she make a statement under oath? She did make statements under oath. She made a statement under oath admitting that she was not under payday status for that day, which would have entitled her to go in the computer and grab the log sheet. Her deposition provided other information. Her allegations all place other people around her. There were two supervisors in the room, she said, within two feet of her. But she didn't have them sign it. She didn't put her own signature on that day sheet when she posted it. She didn't post that day sheet on top of the old day sheet. She discarded it. I mean, it doesn't take a stretch of imagination to say there's an intent to deceive. She knew she wasn't entitled to the two hours, and she tried to get it. And that's directly a violation of the code of ethics. And under the basic labor agreement, Sarko had the right to do what it did. How much money was it? I'm just curious. You may be right. I'm not disputing what you just said. But how much money was at stake here? Your Honor, I don't even know. I know she made a half a million dollar demand for emotional distress. I'm not asking about the demand. I mean, how much money was it to her? I honestly don't know, Your Honor. I honestly don't know. What I do know is that when she posted that, she could have gotten a signature. She didn't get it. She didn't have the right to go in there and take that log sheet out in the first place. And she did. You know, when she went on an FMLA leave, and this whole thing, all these meetings, is about our HR was harassing her, because it's not on the record, whether it's a back injury or it's her inability to see. She drives a long-haul truck. Those are big trucks. She can't see. She had a back injury. I completely agree on one point with plaintiff's counsel. We don't want injured workers working for us. We want them to get better. And until they get better, when they get better, we welcome them back to work. Thank you. Thank you, counsel. We'll hear from counsel for the plaintiff in rebuttal. Let's put two minutes on the clock. Thank you. Not 20. Your Honor, I apologize. I don't have the deposition transcript in front of me, but you had asked about Mr. Duarte's prior testimony on the issue of entitlement to pay. And what I have in my brief notes refers to ER 10, which cites actually to plaintiff's response to ASARCO's motion for summary judgment statement of fact, that I left on 32. And I quoted it, Mr. Duarte commenting on the fact that ASARCO's position was, because when we have meetings with everybody else, it's on company time. And what he was talking about was making a reference that if an employee meets with a union rep, for example, at a coffee shop, that's not a paid meeting. But if an employee meets with a union rep on property, on company property, that that was paid. What are you reading from now? I apologize. I'm reading actually from my own brief because I didn't pull up the deposition transcript. I apologize. But it's ER 10. This is what your client testified to in her deposition? I apologize. No, this is what Mr. Duarte, the union president, testified to because there was, I thought, some misunderstanding on my part or miscommunication on my part that I wanted to clarify that. His testimony is if she meets with the union representative on company property, that she's entitled to be paid. That's right. And so your position is that when she went in and openly changed the time record, she was doing it because she was entitled to be paid? Correct. And she was fired because she changed the records because she wasn't entitled to change the records? She was fired because she stole two hours of time. And to clarify, she was this issue of day pay. She wasn't a day pay employee on that day, but she had supervisory status, which is why she could access the computers and do things with the computers. On that day she wasn't. Not on that shift, though. I agree with you. Not on that shift, but that's why she asked the supervisors, including Jack Oldfather, before she cleared the two hours beforehand. She thought she'd done everything right, and she talked to the— Did she ask Jack Oldfather? Yes. Did she ask him, is it all right if I put this in right now? I don't believe that that's what occurred. I believe what she told him was when she checked in, she said, I'm checking in and I'm going to see the union. I'm checking in now for work. So she checked in with the supervisor at that time. There's no authorizer who would do this. I agree with you. I don't think Jack Oldfather authorized that at all. I think when she got the impression of being authorized was when she's in the pit room, there are supervisors there, and she follows the procedure and makes it public and clears it with the dispatcher. So it wasn't, as they say, some sort of a nefarious act. So what is the gist of your claim here with respect to the employer? It is that she should not have been terminated for changing the records? Yes, absolutely. Can I ask you a question? 100%. It may not be totally irrelevant. How much money was involved in the two hours? How much money did she get as a result of the two hours? When you mentioned that, I was trying to think. I think it's about $75 total. I don't have that total in front of me. The reason I say it may not be totally irrelevant, but I'm not sure, listening to all these facts, that the employer could have won an arbitration on this. Assuming all of the facts are not as favorable for the employer, I could see an arbitrator saying, it's too . . . it's not . . . they are less a penalty. I mean, the arbitrators have tremendous discretion in how to resolve this. Now you're at my core, because that was my position at the time, the terminator. I figure I'm trying to understand what's going on here. Yes, I totally . . . I'm with you on this, because she's a 12-year employee, a supervisory status. I mean, she has those job duties, an eight-year union member, and this is done, what she thinks is public and what she thinks is okay, and there's not even an approach to say, hey, where are we with this? The first effort is to terminate her. I couldn't agree more. And I did want to clarify one other thing, which is there has not been a discussion to withdraw the lawsuit. I was probably reacting a little, but a discussion to do that and go to arbitration, because we had to sue before they would even consider setting an arbitration, in this case. So I did want to clarify that that . . . it wasn't that the plaintiff was being obstructionist in any way about going to arbitration. She tried that process. It filed a cross-claim in the district court to require arbitration. What came of that? Nothing. Nothing. ASARCO, silent. The union, silent. No arbitration set, and we were in a dispute then at that point. Did you join in that? I did not. No. I did not. Thank you, counsel. Oh, thank you. I'm sorry. You have well exceeded your time, but we appreciate the help with the argument. The case just argued is submitted. Thank you very much.
judges: Schroeder, Watford, Korman